ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

GEORGE O. HAGEMAN (CABN 332457)
Assistant United States Attorney

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5044
   Fax: (408) 535-5081
   George.Hageman@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ARNOLD KINMAN LOW,<br><br>    Defendant. | **CASE NO. 3:23-CR-00439-JD**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Court:         Hon. James Donato<br>Hearing Date:  July 15, 2024<br>Hearing Time:  10:30 a.m. |

## I. INTRODUCTION

Ethan Boyes was struck and killed while riding his bicycle through the Presidio. He died because defendant Arnold Kinman Low made the negligent—and criminal—decision to drive his vehicle while under the influence of alcohol. Ethan should still be alive today. His death was entirely avoidable, and Mr. Low needs to be held accountable. Yet no matter what happens at the sentencing, the heartbreaking reality is that nothing can ever bring Ethan back. Ethan's mother, father, two brothers, partner, friends, fellow bicyclists, and yes, the defendant, will live with this tragedy for the rest of their lives.

Based on the nature and circumstances of the offense, the history and characteristics of the

defendant, and the need to protect the public from further crimes of the defendant, the government submits that 24 months' probation is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a).

## II.     PROCEDURAL HISTORY

On November 29, 2023, the Grand Jury returned a two-count Indictment charging Arnold Kinman Low with violations of 18 U.S.C. § 1112 (involuntary manslaughter) and 36 C.F.R. § 1004.23(a)(1) (operating under the influence of alcohol). Dkt. 1. On March 1, 2024, the government filed a two-count Superseding Information charging Low with violations of California Penal Code § 192(c)(2) (vehicular manslaughter) and 36 C.F.R. § 1004.23(a)(1) (operating under the influence of alcohol). Dkt. 11. On March 18, 2024, Low pleaded guilty to both counts of the Superseding Information. Dkt. 24. Sentencing was set for July 15, 2024, at 10:30 a.m.

## III.    OFFENSE CONDUCT

Arnold Kinman Low struck and killed cyclist Ethan Boyes in the Presidio, a place of federal jurisdiction, on the afternoon of April 4, 2023. Low, 81 at the time of the crash (and 82 now), was under the influence of alcohol at the time.

a.   *Events Preceding the Crash*

Low had spent the earlier part of April 4, 2023, at a funeral, burial, and reception for one of his friends in the Daly City area. Low and his two friends carpooled to the events: Low drove to the first friend's house in the Richmond District of San Francisco, left his car there, and rode as a passenger the rest of the way. The funeral and burial happened first, followed by the reception at Original Joe's restaurant in Daly City. *See* Presentence Investigation Report ("PSR"), ¶ 7.

Low's actions at the reception are captured, in part, by surveillance footage. He arrived and received his first drink—a glass of wine—at 1:01:06 p.m. He takes his first sip at 1:01:26 p.m. A passing waiter can be seen topping off his glass at 1:11:23 p.m. From this point forward, the reception area fills up with other people and Low's table, in the corner, is mostly obscured from view. Different waiters circulate with refills throughout the reception. A passing waiter appears to top off his glass at 1:52:03

p.m. based on the amount of liquid before and after. He takes his last sip at 2:37:35 p.m. He and his friends depart the reception at 2:39:51 p.m. *Id.* ¶ 8.

On the way back, they undertook the same carpool in reverse, with Low riding as a passenger until they arrived back at his first friend's home in the Richmond District. Low then picked up his own vehicle—a silver 2008 Honda Fit—and began driving (solo) back towards his home. The route took him northbound through the Presidio on Arguello Boulevard. There are no cameras covering the stretch of road where the crash took place. The nearest surveillance videos found by law enforcement, approximately ¼ mile before the crash site, show Low's Honda Fit stopping at a stop sign and proceeding at normal speed. Low's Honda Fit was not equipped with an event data recorder to record its speed before or at the time of the crash. A later analysis of the Honda Fit shows that it had no mechanical problems contributing to the crash. *Id.* ¶¶ 9–10.

    *b. The Crash Itself*

Law enforcement responded to the scene—in the Presidio, just north of Inspiration Point, and just south of the intersection between Arguello Boulevard and Washington Boulevard—shortly after 3:55 p.m. Upon arrival, they observed a crashed silver 2008 Honda Fit with heavy body damage in the grass next to the southbound lane, facing northbound. The windshield was smashed in and there was a person, later identified as Ethan Boyes, lodged halfway inside. Medical personnel extracted Boyes, who did not appear conscious or alert, and brought him to Zuckerberg San Francisco General Hospital where he was pronounced dead at 4:45 p.m due to "multiple blunt force injuries." *Id.* ¶ 11.

Several witnesses observed different parts of the incident, including three pedestrians and four motorists. Together, they describe the Honda Fit hitting the curb on the righthand (northbound) side of the road, then overcorrecting and veering into the opposite (southbound) bicycle lane, colliding with a bicyclist who had been riding southbound, and then coming to rest in the grass on the other side with the bicyclist stuck inside the windshield. *Id.* ¶¶ 12–18.

A crash reconstruction expert noted the following: (1) weather conditions on this day were mild, unremarkable, and non-contributory, (2) surface conditions were smooth, level, and free of any significant defects, and (3) the car did not brake after the curb hit (based on the lack of brake marks on the road). The

expert was unable to estimate the car's speed prior to the curb hit (other than an estimate based on the posted speed limit) due to the lack of road markings or surveillance footage. However, his higher estimated speed after the curb hit is consistent with pedal confusion (i.e. slamming on the gas pedal instead of the brake pedal after hitting the curb), as well as with the statements from some witnesses about how the car did not appear to brake at all when it crossed into the opposite lane. Separately, investigators also found paint on the tire matching the color of the paint on the curb, consistent with a curb hit. *Id.* ¶ 19.

    c. *Level of Intoxication*

Low also suffered minor injuries in the crash and was taken to the hospital. After Low was treated, an officer began giving Low the required admonitions for an alcohol screening test. The officer noticed the odor of alcohol from Low. The explanation took a long time as Low asked several questions about the process and his options, which the officer answered. During the conversation, Low stated "I'm screwed anyway, right so I should just take the test?" and "I know I've been drinking so I can't, you know…" *See id.* ¶ 20. Low also repeatedly asked how the other person was doing, both during and after the consent discussion. Eventually, Low consented to the test, saying "I'll do it. You know I have nothing to hide. I know I've been drinking." *See id.* The phlebotomist arrived and drew Low's blood. His blood alcohol concentration (BAC) at 6:35 p.m.—2 hours and 40 minutes after the crash at 3:55 p.m.—was 0.041% +/- 0.002%. *Id.*

A forensic toxicologist expert was asked to conduct a backward extrapolation of Low's likely BAC at the time of the crash. The estimate incorporated Low's below-average weight (127lbs), below-average height (5'3"), and above-average age (81). Elderly men typically have a lower alcohol elimination rate in the range of 0.010% to 0.015% (i.e. they metabolize that amount of alcohol per hour) due to their lower total body water as compared to a typical middle-aged man with an alcohol elimination rate of 0.015% to 0.020%. The expert estimated that Low's BAC at the time of the crash (3:55 p.m.) was between 0.068% and 0.081% assuming an alcohol elimination rate of 0.010% to 0.015%. *Id.* ¶ 21.

The greater the lapse of time, the more uncertainty there is in the backtracked estimate. Moreover, the estimate of the level of BAC at the time of the crash makes a number of assumptions. For example, it assumes that (1) Low's alcohol elimination rate is within the 0.010% to 0.015% range expected of a typical

elderly male, (2) Low's total body water is comparable to the average 81 year old male who is 5'3" and 127lbs, (3) Low had a typical amount of food in his system while he was consuming alcohol, (4) Low had not consumed any medication that affected his body's ability to metabolize alcohol, (5) Low had no medical issues at the time that affected the BAC reading, (6) the drinks Low consumed were standard sizes with standard alcohol concentrations, (7) Low's BAC at 6:35 p.m. was within the stated margin of error of 0.002%, and (8) Low's blood alcohol content was on the way down at the time of the crash. The defense would likely procure their own forensic toxicologist if this case went to trial, and that expert may or may not arrive at the same conclusion. Given this uncertainty, Low agreed in the Plea Agreement to having a BAC between 0.04% and 0.09% at the time of the crash. *Id.* ¶ 22.

Surveillance video from the reception (described above) shows Low drinking the equivalent of at least two glasses of wine over the course of 1 hour and 40 minutes. It is possible he drank more, but the crowd in the reception area blocks the camera's line of sight. Low does not appear visibly intoxicated (e.g. stumbling, sloppy) as the group returns to their car. His two friends later reported that Low had 1-2 drinks at the reception and acted normally, and that Low had a "couple" glasses of wine but "wasn't drunk or anything." Both reported that they never went to the bar to get additional drinks. Both reported that Low did not consume any additional alcohol in the car. Both said they did not think Low was intoxicated when they left him. The friends noted that Low was a "between good and average driver" and that he typically uses public transportation. *Id.* ¶ 23.

Additionally, there were some witnesses at the scene who smelled alcohol on Low (e.g. one of the motorists and two SFFD paramedics). That said, other witnesses reported that they did not smell alcohol on Low. The SFFD paramedics additionally noted that Low was acting strange in that he kept repeating the same questions about whether the cyclist would be okay. One thought he was acting strange due to intoxication, while the other thought it was due to shock. Low at one point admitted to them that he consumed alcohol at lunch. *Id.* ¶ 24.

Altogether, the evidence supports that Low was under the influence of alcohol to some extent when he struck and killed Boyes in the Presidio at 3:55 p.m. on April 4, 2023. Although his exact level of intoxication is disputed, he admits that his level of intoxication left him incapable of safely operating his

UNITED STATES' SENTENCING MEMORANDUM   5
3:23-CR-00439-JD

vehicle. Low admits that his negligence was the direct cause of Boyes's death. *Id.* ¶ 25. Thus, he has admitted to and therefore violated the two federal crimes for which he has pleaded guilty—California Penal Code § 192(c)(2) (vehicular manslaughter) as assimilated by 18 U.S.C. § 13, and 36 C.F.R. § 1004.23(a)(1) (operating under the influence of alcohol).

### IV. SENTENCING GUIDELINES CALCULATION

The government agrees with a total offense level of 4. The base offense level is 6. *Id.* ¶ 34. Two points are subtracted because of Low's acceptance of responsibility. *Id.* ¶ 41. The government agrees that Low has no criminal history; he has no juvenile adjudications, criminal convictions, other criminal conduct, pending charges, or other arrests, thus placing him in criminal history category I. *Id.* ¶ 46. Together, the advisory guidelines range is 0–6 months. *Id.* ¶ 75. The statutory maximum is 12 months for Count One and 6 months for Count Two. *Id.* ¶ 74.

### V. APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need for the sentence to protect the public from future crimes of the defendant;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct; and

(6)     the need to provide restitution to any victims of the offense.

## VI.     RECOMMENDED SENTENCE AND SECTION 3553(a) FACTORS

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a sentence of 24 months' probation.

*a. Nature and Circumstances of the Offense*

Low killed a man.  Legally or morally, there is no crime more serious than this.  And while vehicular manslaughter (or the originally charged involuntary manslaughter) are differently situated from premeditated murder in terms of mens rea, that does not detract from the fact that Ethan Boyes's life was tragically cut short, through no fault of Ethan's, at the hands of another.  18 U.S.C. § 3553(a)(1) requires the court to evaluate the "nature and the circumstances of the offense."  The nature of the offense, without context, might favor a significant custodial sentence.  However, the circumstances of the offense—the other half of the required analysis—add important context.  In contrast to a hypothetical drunk driving incident where a driver with a history of DUIs drives with a demonstrable impairment well in excess of the legal limit (along with other aggravating factors clearly linking the death to the drunk driving), the facts here are more muted, although they nonetheless violated the law.

Low drank 1-3 glasses of wine at a funeral reception 1.5-3 hours before the crash.  His first sip was at 1:01 p.m. and his last sip was at 2:37 p.m.  He got behind the wheel of his car at approximately 3:30 p.m.  Nobody forced him to get behind that wheel.  He could have taken an Uber, public transit, or waited.  He chose, instead, to drive home—a route that took him through the Presidio where Ethan Boyes, a champion bicyclist, was doing one of his regular rides.  Most of Low's trip was uneventful, with cameras showing him obeying traffic laws just prior to entering the Presidio.  But as he rounded the curve at around 3:55 p.m., his Honda Fit struck the righthand curb and then overcorrected, veering into the lane of oncoming traffic where, at that very moment, Ethan Boyes happened to be riding.  At the moment of impact, Low's blood alcohol content was between 0.04% and 0.09%.  Though not definitively above the legal limit, there is no dispute that the amount of alcohol in his system rendered him incapable of operating his vehicle in a safe manner.  Put simply, Low's decision to drive under the influence of alcohol—even

this relatively smaller amount—resulted in Ethan Boyes's death.

*b. History and Characteristics of the Defendant*

Among the many tragedies of a homicide case is the fact that the Court and the parties must look to the defendant's life and character, even as the defendant cut short the character-rich life of the victim. Yet that is what 18 U.S.C. § 3553(a)(1) requires: we must focus on Low's history and characteristics which are, apart from this offense, extremely positive.

Low has lived a long life—he was 81 years old at the time of the offense and he is 82 years old now. PSR ¶ 51. He has zero criminal history and zero involvement with the criminal justice system: no juvenile adjudications, no adult criminal convictions, no other criminal conduct, no pending charges, no arrests. *Id.* ¶¶ 44-49. He has a clean driving history with no major incidents, let alone any alcohol-related incidents. He worked for over 45 years before his retirement in 2011. *Id.* ¶ 69. For decades, he has volunteered at his church, been a docent at the museum, performed civil marriage ceremonies, mentored high school students, tutored at the library, and served as the foreperson on a civil grand jury in state court. *Id.* ¶¶ 55, 58. Probation has provided the Court with over 50 letters of support from the community. *Id.* ¶ 60.

Low has also promptly accepted responsibility for his actions. Video footage from the day of the crash shows him asking multiple times if the other man was going to be okay. In the months since, he quickly pleaded guilty to both counts. Dkt. 24. He has shown extreme remorse for what he did to Boyes and his family, writing that "having lost my father at a young age helps me understand and feel empathy for the Boyes family, but the truth is I will never know the depth of pain I have caused his loved ones and greater community [including] the bicycling community." *Id.* ¶¶ 31, 57, 59. He has also paid restitution, pre-sentencing, to Boyes's immediate family as well as to his long-time partner. *Id.* ¶¶ 29, 31. The government understands from counsel that Low and the family have reached a civil settlement.

Ethan Boyes will tragically never get the chance to live as long and as productive of a life as Arnold Low. Low cut it short. Nevertheless, Section 3553(a)(1) requires that Low's positive history and characteristics be taken into consideration in fashioning his sentence.

### c. Protection of the Public

Low is 82 years old now. This is his first crime. He stopped driving after the crash, and he agreed in his plea agreement to relinquish his driver's license and not operate a motor vehicle ever again. Dkt. 24 ¶ 11. He also stopped drinking alcohol after the crash and "does not plan to drink alcohol again." PSR ¶ 66. He will be a federal convict for the rest of his life. His age and his lack of criminal history or prior driving incidents are not excuses to his crime—there is no such thing as a free pass—but they do speak to whether a custodial sentence is necessary to protect the public from Low in the future. The government submits a custodial sentence is not.

## VII.  VICTIM IMPACT

Ethan Boyes cannot be here to tell us about the just outcome. We instead must rely on the statements of those closest to him. The Court has received, as of this filing, victim impact statements from his next of kin (his mother, father, and two brothers) under 18 U.S.C. § 3771(e)(2)(B) and 34 U.S.C. § 20141(e)(2)(B), as well as separate statements from his mother, brother, sister-in-law, and longtime partner. PSR ¶¶ 26, 28. They vary in their opinions. On one end, his mother, father, and two brothers write: "At every turn, we seek the path that we believe Ethan would have wanted. It is our sincerest belief that Ethan would in no way want to see Mr. Low incarcerated, nor would he have wanted our family or Mr. Low and his family to endure the lengthy and painful process that a criminal trial will surely entail." *Id.* ¶ 26. On the other end, his partner writes: "Ethan would have wanted people to be held accountable for their actions and to get the consequences they deserve. I think Ethan would have wanted the driver, no matter his age, to be prosecuted to the fullest extent of the law in order to protect other cyclists from harm." *Id.* ¶ 28. Their shared despair is raw, and they each loved Ethan in their own way. The government is in no position to say whose love matters more or less. Suffice to say, what they share in common besides their heartbreak is a desire for Low to take responsibility and be held accountable. The government believes its recommended sentence accomplishes those goals.

## VIII.  CONCLUSION

No sentence can bring Ethan back. His death was avoidable and Low is responsible. He will have to live with that knowledge for the rest of his life. But that anguish pales in comparison to that which is

felt by Ethan's mother, father, brothers, partner, friends, and fellow cyclists, for they will have to live the rest of their lives without Ethan.  The question, then, is not how to make the world whole.  We cannot.  The question, instead, is what sentence achieves the goals set forth in 18 U.S.C. § 3553(a).  Based on the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to protect the public from further crimes of the defendant, the government submits that 24 months' probation is sufficient—but not greater than necessary—to achieve the goals set forth in 18 U.S.C. § 3553(a).

DATED:  July 1, 2024                                          Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

 */s/ George O. Hageman*
GEORGE O. HAGEMAN
Assistant United States Attorney